CHRISTIAN SCHOOLS, INC.

v.

**TOWN OF ROCKPORT.**

Supreme Judicial Court of Maine.

Argued Nov. 9, 1984.

Decided March 25, 1985.

Lowell D. Weeks (orally), North Windham, for plaintiff.

Calderwood, Ingraham & Gibbons, Paul L. Gibbons (orally), Camden, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

ROBERTS, Justice.

The Town of Rockport appeals from a judgment of the Superior Court, Knox County, declaring that Christian Schools, Inc. (CSI) was entitled to property tax exemption for the tax years 1980 and 1981. Rockport maintains that CSI's campus was subject to taxation because (1) a portion of CSI's campus was used for employee housing; (2) CSI transferred such a significant usufructuary interest in the property to the Christian Mutual Life Insurance Company (CMLI) under a financing arrangement, that the property lost its tax-exempt status; and (3) CSI's reduced activity as of September, 1979, rendered the tax exemption unavailable. Upon review of the undisputed facts, we affirm the judgment of the Superior Court.

I.

CSI owned a 62-acre parcel of land in Rockport on which it operated the Glen Cove Bible College and the Glen Cove Christian Academy. Because of financial difficulties, neither school opened for classes for the academic year beginning in September of 1977. CSI was, and remains, a non-profit corporation under the appropriate Maine statutes. After educational activities ceased, efforts were made to continue to maintain the buildings and the grounds, administrative records were stored on the property, and regular access to and use of the files for transcripts of former students existed. Further, the facilities were used by other schools with CSI's permission.

In order to avoid a mortgage foreclosure, CSI received a loan from CMLI of Concord, New Hampshire, in January of 1981. Under the terms of that loan, CMLI had a right of first refusal on the purchase of the property, an option to purchase, and an equity interest in the land.[1] The property was ultimately sold by CSI to a third party in September of 1981.

Rockport first assessed taxes against CSI's property in the amount of $15,487 for the 1980 tax year and $17,035.70 for the 1981 tax year. The controversy in the declaratory judgment action was whether the tax exemption for the Rockport property continued, although the on-premises educational activities ceased in August of 1979.[2]

---

1. *See infra* section III for discussion of these provisions.

2. 36 M.R.S.A. § 652(1)(A) & (B) (1978 & Supp. 1983) provide in pertinent part:

**§ 652. Property of institutions and organizations**

The following property of institutions and organizations is exempt from taxation:

## II.

Rockport contends that CSI was a literary and scientific institution subject to 36 M.R.S.A. § 652(1)(B) which provides that any part of a building used for employee housing shall not be exempt from taxation. Because portions of certain buildings were used as the home of the "security man" from September, 1977, to December, 1980, Rockport argues that for the tax year commencing on April 1, 1980, the portions of the property so used should be subject to real estate taxation.

▉However, the parties have stipulated that CSI is a *charitable and benevolent* organization, rather than a literary and scientific organization, and is therefore subject to section 652(1)(A). That section differs from section 652(1)(B) in that there is no denial of the exemption for portions of the property used for housing employees. We do not reach, therefore, the question whether use of a part of a building for housing a "security man" would subject those areas to real estate taxation under section 652(1)(B).

## III.

On January 22, 1981, CSI conveyed some of its ownership rights in the college campus to CMLI, a mutual life insurance company based in New Hampshire. A document entitled "Grant of Rights" recorded in the Knox County Registry of Deeds provided the following three provisions:

(1) a right of first refusal, contingent solely upon CSI's decision to sell, exchange, mortgage, transfer by gift or otherwise convey the premises;

(2) an option to purchase the property, contingent and arising on or after the second anniversary of the closing date (January 22, 1983); and

(3) an equity interest in the premises, contingent upon sale of the property and providing for 50 percent of any proceeds received if over the amount of the base debt.

▉ Rockport contends that, unlike a standard mortgage, legal title remained in CSI as a result of this grant of rights. Further, the option to purchase, the right of first refusal, and the 50 percent equity interest in the property conveyed under the grant of rights was not subject to any defeasance. Thus, Rockport argues that CMLI could require CSI to sell the property to it at the cost of the base debt and could force a sale of the property for the base debt. Because CMLI controlled the alienation of CSI's campus property, Rockport contends that CMLI must be deemed to own the property as that term is used under the tax exemption statute.

The grant of rights, however, must be placed in context. CMLI came forward to loan second mortgage money just prior to the foreclosure of the first mortgage which was in default. A promissory note and mortgage constituted the documents in the extension of credit, and the grant of rights was an ancillary element of the overall financing arrangement. The rights conveyed were *contingent rights* rather than *ownership rights.* Under the right of first refusal, CSI retained full rights to determine the terms and method of transfer of the premises should it elect to sell. Further, CMLI's right to buy was limited to

**1. Property of institutions and organizations.**
**A.** The real estate and personal property owned and occupied or used solely for their own purposes by benevolent and charitable institutions incorporated by this State, and none of these shall be deprived of the right of exemption by reason of the source from which its funds are derived or by reason of limitation in the classes of persons for whose benefit such funds are applied.

**B.** The real estate and personal property owned and occupied or used solely for their own purposes by literary and scientific institutions. If any building or part of a building is used primarily for employee housing, that building, or that part of the building used for employee housing, shall not be exempt from taxation.

the right to buy on terms established by CSI.

 Rockport also reasons that because CSI granted to CMLI an equity interest entitling CMLI to a sum equal to 50 percent of the amount by which total sales receipts exceeded the base debt, 50 percent of the equity would inure to the benefit of CMLI, and not to CSI. This, according to Rockport, would violate the requirement of section 652(1)(C)(3) which requires that "[a]ll profits derived from the operation thereof and the proceeds from the sale of its property [be] devoted exclusively to the purposes for which it is organized."

Properly construed, however, section 652(1)(C)(3) requires that proceeds *after* payment of debt and expenses incurred under a financing arrangement be devoted to the organization's purposes. We see no reason to characterize CMLI's contingent 50 percent equity interest as anything other than a debt or expense incurred by CSI to enable it to obtain financing in an arms-length transaction. There is no basis upon which to distinguish this financial package from a standard mortgage arrangement, which would not preclude the availability of the property tax exemption.

### IV.

 Although Rockport concedes that the property was put to limited use after September of 1979, it emphasizes that thirteen of the fourteen buildings on the campus remained completely unoccupied and that most of the 62 acres of land located on the campus was not used. Rockport also contends that the nonuse of the property is not incidental to any purpose for which CSI

was incorporated. Because the public purpose for the tax exemption is to lower the cost of education in Maine, and because CSI neither used nor occupied the premises after September of 1979, Rockport reasons that the purpose behind the tax exemption no longer existed for CSI.

These contentions are without merit. First, although educational activities had ceased, administrative records were stored on the property, and regular access to and use of the files for transcripts of former students existed. To the extent the facilities were further used, it was by other schools with CSI's permission and not for profit-oriented purposes.[3] Real estate tax exemption cannot be denied solely on the basis of a school's inability to operate at full capacity, and for purposes of resolving this case we shall not engage in line-drawing in connection therewith.[4] CSI continued as a viable entity although it relocated to Portland. Because its economic integrity in its new location depended at least in part upon its ability to sell the Rockport land, the land continued to be used for a tax-exempt purpose so long as any proceeds in excess of the cost of obtaining financing were applied to the benevolent purposes of the institution.

The entry is:

Judgment affirmed.

All concurring.

---

**3.** In *Greenacre Baha'i Institute v. Town of Eliot,* 150 Me. 350, 354, 110 A.2d 581, 584 (1954) we stated that

[i]n each situation where exemption is claimed, there must be a careful examination to determine whether in fact the institution is organized and conducting its operation for purely benevolent and charitable purposes in good faith, whether there is any profit motive revealed or concealed, whether there is any pretense to avoid taxation, and whether any

production of revenue is purely incidental to a dominant purpose which is benevolent and charitable. When these questions are answered favorably to the petitioner for exemption, the property may not be taxed.

**4.** *See Osteopathic Hospital of Maine v. City of Portland,* 139 Me. 24, 28, 26 A.2d 641, 642 (1942); *Christian Science Pleasant View Home v. City of Concord,* 117 N.H. 239, 242–43, 372 A.2d 267, 268–69 (1977).